Maldonado, Demandante y Apelante, *v.* The Porto Rico Drug Co., Demandada y Apelada.

Apelación procedente de la Corte de Distrito de San Juan, Primer Distrito, en pleito sobre indemnización de daños y perjuicios.

No. 2624.—Resuelto en abril 17, 1923.

Daños y Perjuicios por Negligencia—Prueba Contradictoria—Error Manifiesto en su Apreciación.—Analizada la prueba practicada en este caso, se decidió que al apreciarla cometió la corte de distrito un error de tal modo manifiesto, que aun en el caso de estimarse dicha prueba contradictoria, procedería la revocación de la conclusión a que llegara.

Id.—Diligencia de un Buen Padre de Familia.—Estudiada la evidencia aportada en relación con el último párrafo del artículo 1804 del Código Civil, se concluyó que no era suficiente para probar la defensa alegada, o sea, la de que la demandada había actuado con la diligencia de un buen padre de familia para prevenir el daño.

ID.—ALEGACIONES—PRUEBA DE LOS DAÑOS—SERVICIOS DEL MENOR—ANGUSTIA Y
SUFRIMIENTO DE LOS PADRES.—La pérdida de servicios no constituye un daño
especial que sea necesario alegar. El montante de la indemnización a que
un padre tiene derecho por la muerte de su hijo menor causada por la negli-
gencia de otro, es aquella suma que, considerando todas las circunstancias
del caso, es justa y razonable; y al determinar el importe de la indemni-
zación puede tenerse en cuenta no sólo la pérdida de los servicios del niño
durante su menor edad y los gastos de asistencia médica y de entierro, sino
también la angustia y sufrimiento moral de los padres.

ID.—PADRE LEGÍTIMO—HIJO—CAUSA DE ACCIÓN.—Se alegó por la apelada que
no habiéndose probado que el demandante sea padre legítimo del menor Luis
Maldonado, no tiene derecho a reclamar, de acuerdo con la ley vigente al
ocurrir el accidente. En la demanda se alegó que el demandante era *"pa-
dre* de Luis Maldonado," y habiéndose probado en el acto del juicio lo ale-
gado así: declaró Josefa Quiñones y dijo que era casada con Ignacio Mal-
donado, el demandante, y que "tenía un *hijo* que se llamaba Luis Maldo-
nado," y el demandante declaró también y dijo que era el marido de la
señora Quiñones que acababa de declarar y que tenía un hijo llamado Luís:
los otros testigos al hablar del hijo, lo designaron como "hijo," y de los
padres, como "padres" simplemente, *se resolvió:* que dicha prueba, no
objetada, demuestra que el niño de que se trata era hijo legítimo de Igna-
cio Maldonado y de Josefa Quiñones.

Los hechos están expresados en la opinión.

Abogados del apelante: *Sres. C. Coll Cuchí, P. Gonzá-
lez García* y *P. Nelson.*

Abogado de la apelada: *Sr. A. R. de Jesús.*

EL JUEZ PRESIDENTE SR. DEL TORO, emitió la opinión del
tribunal.

Ignacio Maldonado inició este pleito en la Corte de Dis-
trito de San Juan, contra la Porto Rico Drug Co., en recla-
mación de cincuenta mil dólares por daños y perjuicios su-
fridos por la muerte de su hijo Luis, de ocho años de edad,
ocasionada por ciertas cápsulas de chenopodio indebidamente
vendida por la demandada. Negó la demandada y alegó
como defensas afirmativas que si el niño murió intoxicado,
la muerte no fué ocasionada por la droga misma, sino por
falta de cuidado en su administración, y que la demandada
había ejercitado el cuidado de un buen padre de familia al
nombrar al dependiente que despachó la droga en cuestión.

Fué el pleito a juicio, se practicó una larga prueba tes-
tifical y pericial y la corte finalmente dictó sentencia decla-

rando la demanda sin lugar, con costas al demandante. La corte sentenciadora, en su opinión, después de referirse a las alegaciones, se limitó a consignar lo que sigue:

"Celebrado el juicio y practicada la prueba, la corte ha llegado a la conclusión de que el demandante no ha probado que el niño Luis Maldonado falleciera por envenenamiento de chenopodio, ni por ningún otro tóxico, ni ha probado los daños ocasionados al demandante por el citado fallecimiento."

No conforme el demandante, apeló para ante esta Corte Suprema, señalando la comisión de tres errores, a saber: 1, la corte erró al declarar que el demandante no probó que el niño Luis Maldonado, falleciera por envenenamiento de chenopodio, ni por ningún otro tóxico; 2, la corte erró al declarar que el demandante no había probado los daños ocasionados y 3, la corte erró al declarar sin lugar la demanda.

Planteado así el debate, procederemos al estudio del primer error. Es necesario examinar la prueba practicada. Para que el error exista tendrá la evidencia que demostrar, primero, que el niño Luis Maldonado falleció el 19 de agosto de 1920; segundo, que su muerte se debió a las cápsulas de chenopodio que se le dieron a tomar el día 18 de agosto de 1920; tercero, que dichas cápsulas fueron vendidas por la demandada, y cuarto, que la venta se hizo negligentemente entregando cápsulas que contenían una cantidad mayor de chenopodio que la recetada por el médico.

Con respecto al primer extremo no hay duda alguna. Luis Maldonado falleció en la madrugada del día 19 de agosto de 1920 y su defunción fué inscrita en el Registro Civil de Caguas, término municipal en que ocurrió el fallecimiento.

El segundo extremo requiere el examen de una larga prueba documental, testifical y pericial.

La documental consistió en la certificación de defunción y en la de autopsia. La primera se introdujo así:

"Dte. Presentamos como prueba, en primer término, una certificación del Registro Civil de Caguas acreditando la defunción de

Luis Maldonado Quiñones.—Ddo. (Lcdo. de Jesús); ¿Cuál es el objeto de la parte al presentar como prueba esa certificación?—Dte.: Yo presento como prueba esa certificación.—Ddo.: Queremos saber el objeto.—Dte.: Para probar todo lo que legalmente se pueda probar con ella.—Juez: La certificación, a juicio de la Corte, es para probar la muerte del individuo.—Ddo: Si es para probar que murió tal día, no tenemos objeción.—Ddo. (Lcdo. Tous): Haciéndose constar que no se objeta en cuanto tienda a probar la muerte del del niño, pero no ningún otro hecho.—Juez: Se admite. Se marca Exhibit A del demandante.''

Y dice:

''Número 113.—Luis Maldonado y Quiñones.—En Caguas, P. R., el día diez y nueve de Agosto de mil novecientos veinte, siendo las nueve de la mañana ante mí, Doctor Víctor Coll y Cuchí, encargado del Registro Civil, comparece Carlos Rivera, mayor de edad, de estado soltero, de profesión empleado, natural de Caguas y declara: 1. Que Luis Maldonado, de seis años de edad, de estado &ast; &#x2617; &ast; natural de Caguas de la raza blanca, de profesión &ast; &ast; &ast; y avecindado en el Barrio de Bairoa de Caguas, falleció a las doce y media de la mañana del día diez y nueve de Agosto de mil novecientos veinte a consecuencia de envenenamiento por chenopodio, según certificación del Doctor A. García de Quevedo.—3 Que era hijo legítimo de Ignacio Maldonado y de Josefa Quiñones, naturales de Caguas, casados y residentes en Caguas.—4. Que los abuelos paternos son: Pablo Maldonado y Josefa Porrata, casados, naturales y vecinos de Caguas; y maternos son: Pedro Quiñones y Felipa Pérez, difuntos.—5. Que hace esta declaración como encargado por la familia del finado.—6. Que el cementerio en que se ha de dar sepultura al cadáver es el de esta ciudad: Así lo declaran ante mí, en presencia de los testigos Rafael Arena, mayor de edad, de estado casado, de profesión empleado, natural de Mayagüez y avecindado en la casa número 56 de la calle de Padial de Caguas y Ulises Martínez, mayor de edad de estado viudo, de profesión farmacéutico, natural de Las Piedras y avecindado en la casa No. 34 de la calle de Jiménez Sicardó de Caguas, cuyos testigos me garantizan que el cadáver de que se trata es el de la persona indicada:—Leída esta acta, la aprueban todos los que en ella figuran y la firman; haciéndolo por los que no supieren aquellos a quienes rogaron, sellando yo con el sello de esta oficina y firmándola con mi propia firma, de todo lo que certifico:—Carlos Rivera.—Declarante.—Rafael Arenas.—Ulises A. Mar-

tínez.—Testigos.—Dr. V. Coll y Cuchí, encargado del Registro Civil."

La segunda es como sigue:

"AUTOPSIA DEL CADÁVER DEL NIÑO LUIS MALDONADO.—A las 10 de la mañana en el Cementerio Municipal. Niño como de seis a siete años de edad, blanco, bien formado. Su cuerpo no presenta lesión exterior alguna.—Congestión hipostática de la espalda y en el vientre varias manchas verde azuladas, producto de la putrefacción que comienza, las que aparecen también en las piernas. Rigor mortis muy marcado en las piernas y muy poco marcado en las extremidades superiores.—Abierta la cavidad toráxica se encontraron todas las vísceras de esta cavidad en estado normal. Los pulmones flotan en el agua y el corazón aparece vacío.—Abierta la cavidad abdominal se encontraron el estómago y los intestinos algo dilatados por los gases y la vejiga conteniendo de una a dos onzas de orinas.—Los riñones, el pancreas y el hígado aparecen en su posición y tamaño.—Abierta la cavidad craneana se encontró la masa encefálica edomatosa y anemiada y las meninges algo congestionadas especialmente en su parte basilar."

La prueba testifical describe del siguiente modo los hechos ocurridos.

Declaró la madre del niño, Josefa Quiñones, en parte, así:

"El primer día," expresó, "no le dí la medicina porque comió dulce de uno que le llevó el papá, pero por la noche al otro día le dí una cucharada de aceite que me aconsejó el doctor que le diera, y al día siguiente en las primeras horas de la mañana, como me dijo, le dí una cápsula y a la media hora una cucharada de aceite de castor, y allá, a las 12 cuando terminé de dárselo dice el niño: estoy mareado, y se recostó de una hamaca que tenía en la sala, y yo lo cogí y le toqué pero lo notaba demasiado mongo y entonces mandé a buscar al papá y vino el papá y le digo: mira como está el niño, y fué y mandó un doctor a casa y al llegar ya estaba mi hijo casi muerto, que no me conocía."

Refiriéndose al doctor Rivas, sigue la madre declarando:

"Me dice: ¿Qué le ha dado Ud. a este niño? Un purgante. ¿Qué fué? y cogí la cajita y le dije: estas cápsulas, y como aún no había terminado de dárselas, me quedaba una y dice: esto es grave—,

pero parece que no queriéndome decir, como madre que estaba des-
consolada, cuando se vió con el papá le dijo. Entonces vino el papá
y me dice: el niño está envenenado según me dice Rivas, y dije: Ay,
mi madre! Llama a Luis (el médico que recetó) y dile a Luis que
el niño está envenenado a consecuencia del purgante recetado por él,
y al momento llegó Luis, a las 3 de la tarde, porque se le puso un
telegrama.''

Luego, a preguntas de uno de los abogados de la deman-
dada, contesta:

''No tuvo enfermedad, era un niño robusto, contento, alegre; eso
es lo que siento. Me parece que lo estoy mirando. El lo único que.
tenía era que estaba desganado, de todo pedía en la mesa y de nada
comía, y dijo: Hay que resolver porque no se puede dejar este niño
así tanto tiempo.''

Compareció a declarar el padre del niño, y en parte,
dijo:

''Yo había salido para el pueblo a casa de Pancho Pereira, y como
a los 10 o 15 minutos de estar allí ví un hijo mío que llegó de súbito
en un caballo y dice: Papá, que vayas con un médico que el niño
está grave.

　　　*　　　　*　　　　*　　　　*　　　　*　　　　*　　　　*

''Por la mañana ella fué a darle el purgante y en eso ví que el
niño sufría demasiado y dije: me voy, mandé a buscar el caballo y
monté y cuando daba la vuelta por la puerta de golpe salió el niño
contento y dice: Papá, me tomé una, y dije: Gracias a Dios! porque
el niño sufría, la devolvía.''

Contestando luego a las preguntas de la parte deman-
dada, expresó que a su regreso observó que el niño no lo co-
nocía: ''yo lo llamaba y hacía así, y yo lo cogía así y notaba
el cerebro'' * * * ''a cada momento le daban unos
temblores'' que ''a medida que se acercaba la muerte enton-
ces iban apretando más.''

Siguen las declaraciones de los doctores Rivas y Gonzá-
lez que asistieron al niño. Participan sus manifestaciones
de una doble naturaleza: la del testigo, que se refiere a he-
chos en que intervino directamente; la del perito, que esta-

blece determinadas conclusiones a virtud de sus conocimien-
tos especiales sobre la materia.

El primero, o sea, el doctor Rivas, en parte, dijo:

"Yo fuí llamado allá por el mes de Agosto para atender este niño.
El padre vino donde mí y solicitó de mis auxilios; le pregunté de
qué se trataba y dijo que un niñito que tenía muy grave. Como él
vive un poco distante del pueblo le pregunté de qué más o menos se
trataba y me dijo que el niño había tomado unas medicinas y desde
entonces se había agravado. Le pregunté más o menos qué clase de
medicina y dijo que unos purgantes para la anemia. Le dije que
si había sido timol o chenopodio y dijo que eran unas cápsulas que
olían a pasote. Yo estaba seguro que le había dado chenopodio y le
pregunté la cantidad que le había dado y que edad tenía el niño, y
me dijo que le habían dado unas cápsulas bastante grandes, y me fuí
allá. Llegué a la casa y encontré el niñito en un estado sumamente
grave, un estado de postración máxima, inconsciente, en un estado de
decaimiento, un poco sianótico, húmeda la piel, no respondía a nin-
gún estímulo, un cuadro completamente grave. * * *

"Esto fué como a mediodía. En seguida le dije a la familia la
gravedad del caso y me puse a trabajar. Inmediatamente ordené
un purgante, que se fué a buscar en seguida, se le dió para producir
una evacuación, y asimismo le hice unos lavados intestinales, y en
seguida de esto ordené que se le pusiese una enema de café negro
y se le diese a tomar luego. Mandé ponerle botellas calientes a los
pies porque estaban frías las extremidades; estuve allí un rato ob-
servando el niño y luego me fuí. En seguida volvieron a buscarme
y llevaron otro médico. Eso es todo lo que sé. Yo hice un pronós-
tico de gravedad. * * *

"Yo me incliné a creer que aquel niño había tomado la droga en
cantidad excesiva, en vista de los síntomas que él presentaba."

Dijo el doctor además que había comprobado el día que
asistió al niño la droga que se le había administrado, ha-
biéndosele mostrado la cajita en que había venido y una cáp-
sula de las que se le habían dado a tomar. Se le mostró una
cápsula introducida como prueba y la reconoció como "la
misma quizás" que vió el día indicado.

El doctor González, que llegó después, depuso, en parte,
así:

"Un día como a las 2 de la tarde recibí del padre de este niño un telegrama alarmante en el que se me daba cuenta de la gravedad del niño, indicándome en el telegrama su gravedad por un purgante que yo le había dado. Me decía que partiera para allá que había gravedad en el niño.

"Inmediatamente tomé un carro y me dirigí a la población de Caguas, y cuando pasaba para casa de la familia del Sr. Maldonado me encontré con el Sr. Maldonado que me esperaba en el pueblo. Allí medio compungido me dijo que su niño estaba envenenado, y le dije: Vamos a ver, y seguimos en el mismo automóvil y cuando entré a la casa encontré a la madre desolada, me acerqué a la cama y observé el cuadro patológico que se desarrollaba y me llenó de espanto aquello, encontré el niño en estado comatoso, la cornia insensible, la pupila dilatada, la lengua pesada y relativa quietud. Inmediatamente le pregunté: ¿Qué medicina le han dado a este niño? La que tu diste.—¿Cómo qué tiempo hace de eso? Aquella que recetaste en el mes de julio en Gurabo, unas cápsulas. ¿Qué clase de cápsulas le dieron a Uds.? Y dice: Me dieron 4 cápsulas grandes, y dije: ¿Son como esas cápsulas blancas? y dice: No, son grandes, amarillas; eso me llenó más de terror y dije: El niño está envenenado; venga la medicina. Me trae el padre unas cápsulas grandes amarillas y le digo: Le han envenenado el muchacho este, pero manos a la obra."

Y, refiriéndose al parecer al padre, expresa, además, el doctor:

"Le dije: Llame otro médico para que venga a compartir esas responsabilidades conmigo, y empezamos a ponerle inyecciones de aceite alcanforado, estricnina, paños de café negro, grandes dosis de café para ingerirle para estimularle a ver si se contrarrestaban los efectos, lo sumergimos en un baño de agua a una temperatura alta y conseguimos aliviar el niño un poco hasta cierto punto; en eso vino el Dr. Quevedo y fuimos de opinión unánime que era caso perdido. Hicimos todo lo posible cuando vimos que la fiebre estaba tan alta; agotamos todos los medios, reconociendo que era un caso muy desesperado. Yo me vine a San Juan. El vino a expirar después de las 12 de la noche, allá como a la 1. * * * "

Entonces declaró el doctor García de Quevedo que no intervino tan directamente como los anteriores en el caso, pero que vió al niño, escuchó las manifestaciones hechas en el mo-

mento mismo de su enfermedad y de su muerte y practicó la autopsia del cadáver. . En parte dijo:

"Yo examiné el cadáver, abrí las 3 cavidades, toráxicas, abdominal y craneal, y en la primera no encontré nada normal, el corazón sano, pulmones sanos; la cavidad abdominal ocupaba su posición normal y su tamaño normal, pero en el cerebro encontré una edema marcada en la masa encefálica y una ligera congestión de las meninges, sobre todo la parte que afecta el cerebro, y en vista de la historia médica, en concepto mío el niño murió. * * * "

Fué interrumpido y sujeto a un largo y hábil interrogatorio y contrainterrogatorio, quedando en pie sus manifestaciones acerca de que el niño "había muerto de una droga que afectaba al cerebro, porque había solamente edema del cerebro," que el niño "no había muerto de enfermedad" y que conectando los datos que se le habían proporcionado con respecto a lo ocurrido y el resultado de la autopsia, podía deducirse la muerte por chenopodio.

Existe también la declaración del doctor Coll y Cuchi que, en lo pertinente al extremo que examinamos, dijo: Que cualquier niño que tomara tres de las cápsulas que se le dieron al niño de que se trata en este caso, moriría fatalmente, sin tratamiento alguno posible para salvarlo, y que: "El chenopodio llega al intestino y de ahí pasa inmediatamente a la sangre, a la circulación, y la sangre lleva a los distintos sitios el chenopodio. Respeta completamente todas las vísceras neutrales, de modo que el hígado permanece igual, el mismo intestino, si acaso un poco más de sangre que los centros nerviosos que son los que sufren el envenenamiento. Como una de las propiedades de esta medicina es provocar una hipercrinia, que quiere decir una secreción más abundante de la que debe ser. Las meninges son dos capas de tejido, una que cubre el cerebro y otra que está adherida al cráneo por dentro, y dentro de esas dos láminas hay un líquido muy fino que sirve para cuando hay un movimiento de cabeza grande le sirva de equilibrio dentro del cerebro

para que no haya *shock* con ese movimiento, y ese líquido al hacer la fricción engendra más calor, un lubricante, provoca una secreción mayor de la que debe hacer, de modo que produce una presión interna, intracraneana, y también provoca una himperenia del cerebro y comienza una presión intracraneana de tal naturaleza que inmediatamente el niño empieza a perder la razón, a perder todas las facultades, el cerebro que es lo que regula todas las funciones del cuerpo está más débil, vienen convulsiones, después viene el coma y luego la muerte.''

A nuestro juicio no es posible leer la prueba practicada de la cual hemos extractado lo que antecede, sin que en la conciencia del juzgador surja la misma conclusión a que llegaron el padre, la madre y los tres médicos en el mismo día del suceso frente a la realidad de los hechos. El niño estaba relativamente bueno y en pie por la mañana. Lo único extraño que tomó fué la medicina de que se trata. A las tres o cuatro horas los síntomas se presentaron y poco tiempo después murió. Y no ya los profanos, sino los técnicos que intervinieron, sin vacilación alguna, atribuyeron la muerte a la droga administrada.

¿Modifica la prueba pericial aportada por la demandada la conclusión que impone la realidad de los hechos? Veámoslo.

Primero declaró el perito químico Sr. del Valle Sárraga, luego el perito médico Dr. Martínez Roselló.

A del Valle Sárraga se le envió el estómago, parte del intestino delgado, parte del hígado, un pedazo del cerebro y un riñón y contestó que examinadas estas vísceras no encontró en ellas indicio de veneno alguno. Respondiendo a preguntas de la parte demandante dijo que del hecho de no haber encontrado aceite de chenopodio en las vísceras no podía concluirse que el niño no hubiera tomado chenopodio. Y dijo además, que si la droga que se toma se absorbe rápidamente no es posible encontrarla porque se descompone en

cuerpos simples y que una persona no podría morir a vir-
tud de los efectos de chenopodio sino después de absorverlo.

Siendo esa, en síntesis, su declaración, en vez de destruir
afirma la teoría de la demanda.

La declaración del perito médico es larga y difícil de con-
densar. Ocupa veintiocho páginas de la transcripción. Su
tendencia es demostrar que el doctor González no practicó
el debido exámen del niño antes de recetar el chenopodio;
que el aceite de castor recetado fué insuficiente; que las
cápsulas no se administraron debidamente; que el café en
vez de bien hace daño en casos de envenenamiento por che-
nopodio; que la dosis suministrada al niño no era necesaria-
mente mortal, sobre todo si se hubiera administrado en de-
bida forma con el suficiente aceite de castor, y que la autop-
sia no demostraba que el niño hubiera muerto envenenado.

Con respecto a los efectos tóxicos del chenopodio y a las
dosis que podían administrarse sin riesgo alguno, la decla-
ración del perito que parecía tener gran fuerza en sus pri-
meras manifestaciones, la perdió en las segundas, así:

Declarando en la sesión de la mañana, expresó:

"T. Se han llegado a aplicar dosis hasta de 3 gramos. La Fun-
dación de Rockefeller, que ha tratado 50,000 casos, entre los Malayos
en Filipinas, lo ha aplicado en la forma siguiente: el día antes: un
purgante de sulfato de magnesia (y he de llamar la atención a que,
en este caso, a pesar de las dosis elevadas, no se ha usado substancia
grasa); se ha empleado solamente sulfato de magnesia el día anterior;
el siguiente día, a las siete de la mañana, una dosis de un gramo, o
sea, 15 gotas del medicamento; a las ocho otro gramo; a las nueve otro
gramo; y una hora después un purgante de aceite de castor. Y en
estas condiciones, según las estadísticas de esta Fundación de Rocke-
feller, en 300,000 casos no se ha causado una sola defunción.

"A. ¿De modo que han sido dosis de 3 gramos?—T. Tres gramos
en un día.

"A. ¿Qué equivale?—T. A cuarenta y cinco gotas.

    \*       \*       \*       \*       \*       \*       \*

"A. ¿Es tóxica una dosis de chenopodio de 10 mínimas?—T. No,
señor. La National Standard de los Estados Unidos dice que la dosis

para niños es de 5 a 10 gotas, y el Dispensario de los Estados Unidos, publicado en 1918, en su edición 17, dice también que la dosis es de 5 a 10 gotas para los niños.

"A. ¿Tratándose del aceite de chenopodio, dada su densidad, 1 gota es equivalente a 1 mínima?—T. Dada la poca densidad y consistencia .del chenopodio 1 gota es equivalente a 2 mínimas.

"A. ¿De modo que 10 gotas vendrían a ser 20 mínimas?—T. Sí, señor, 20 mínimas.

"A. ¿Así es que podrían administrarse según eso 20 mínimas?— T. Sí, señor.

"A. ¿A un niño de edad de 6 años?—T. Sí, señor.

"A. ¿Hasta qué dosis puede administrarse a un niño próximamente de 8 años el aceite de chenopodio sin que produzcan intoxicación?—T. Se ha llegado a la conclusión, según los experimentos y observaciones hechas en el Hospital de Santo Tomás de Panamá, que a un niño se le puede administrar 1 gota de aceite esencial de chenopodio por año de edad. De modo que un niño .de 8 años puede recibir de una sola dosis 8 gotas.

"A. ¿O sea, 16 mínimas?—T. Sí, señor.

"A. ¿Esa dosis puede repetirse en ciertas condiciones?—T. Puede repetirse 3 veces, siguiente el procedimiento que se sigue con los adultos, que es repetir la dosis 3 veces al día. En el Hospital de Santo Tomás el procedimiento en cuanto a los adultos era: 3 dosis, durante 3 días consecutivos, y después daban el purgante o de aceite de castor o de sulfato de magnesia. Posteriormente rebajaron la dosis a un solo día, y después el purgante.

"A. ¿En qué forma puede repetirse esa dosis?—T. A intervalos de 2 horas. Se da la primera; a las 2 horas la segunda y la tercera a. las dos horas, por más que en esto no hay fijeza, porque algunos aplican la primera y a las 3 horas la segunda y después a las 3 la tercera; y otros a las 2 horas. En esto no hay uniformidad, puesto que el único fin es impedir la rápida absorción, dado que el medicamento no actúa inmediatamente sobre los parásitos.

"A. ¿A qué dosis se refiere en ese caso de administrar 3 dosis sucesivas a intervalos de 2 horas?—T. Quince gotas. De modo que se han llegado a aplicar 45 gotas, en una sola dosis, en dicho Hospital.

"A. ¿Y con respecto a un niño?—T. A un niño de esa edad corresponde la tercera parte.

"A. ¿Qué sería?—T. Once gotas y cuarto.

"A. ¿En cada aplicación?—T. En cada aplicación."

Y en la sesión de la tarde, dijo:

"A. Ud. habló de la equivalencia de la mínima con la gota en cuanto al chenopodio teniendo en cuenta su viscosidad. Sírvase repetir, doctor.—T. Yo tuve un lapsus verbo, cuando hablaba de eso. Dije primero que el chenopodio, como aceite esencial, era poco denso y después me equivoqué al hacer la equivalencia con la mínima, puesto que dije lo contrario de lo que debía haber dicho: he debido decir que en una mínima se contienen dos gotas de aceite esencial de chenopodio, y dije que una gota equivalía a dos mínimas.

"A. ¿Una gota de agua es una mínima?—T. Una mínima.

"A. ¿Pero una mínima de aceite esencial?—T. Se necesitan dos gotas para formar una mínima."

De suerte que, según el propio perito de la demandada, la dosis para un adulto es la de veintidós mínimas, y media y para un niño de ocho años la de doce mínimas, y en este caso el niño llegó a tomar treinta mínimas, o sea, una dosis superior en diez y ocho mínimas a la fijada para él y en siete y media a la fijada para los adultos.

El error de la corte al apreciar la evidencia en este punto es de tal modo manifiesto, que aun cuando se concluyera que la prueba era contradictoria no sería contrario a la constante jurisprudencia de este tribunal corregirlo en apelación.

Dilucidados los extremos que anteceden, veamos si las cápsulas de chenopodio que causaron la muerte al niño de que se trata fueron vendidas por la demandada y si la venta se realizó en condiciones tales que envuelvan la responsabilidad de la Porto Rico Drug Company.

Que la venta se realizó no hay duda alguna. Este hecho no se discute por la parte demandada. Son las circunstancias de la venta las que es necesario investigar.

El padre del niño declaró que encontrándose su hijo pálido y mal del estómago lo llevó donde el doctor González que lo examinó acostándolo en un diván y aplicándole varios aparatos, dándole finalmente una receta que no pudo

ser despachada en Caguas y lo fué finalmente en San Juan, en el establecimiento de la demandada, así:

"Dí la receta y al dar la receta entonces el dependiente me dió un papelito y salí afuera y como a la media hora vine·y me la dieron y me la eché en el bolsillo y me vine."

La cajita recibida por el padre fué entregada a la madre y tres de las cuatro píldoras que contenía le fueron dadas por ella al niño en la forma que explicó, siguiendo las instrucciones del doctor González.

La cápsula restante fué entregada por el padre al doctor Coll y Cuchí, oficial de Sanidad de Caguas, encargado del registro civil, según consta en las declaraciones del padre y del doctor, y fué presentada en el juicio como prueba.

Las cápsulas recetadas por el doctor González fueron cuatro de tres mínimas por cápsula. La cápsula entregada al doctor Coll como igual a las que tomó el niño era de diez mínimas.

La demandada, por medio de su dependiente Francisco J. Moreno, que declaró en la vista, sostuvo que las cápsulas despachadas, según se indicaba en la receta, fueron de tres mínimas.

La prueba es, pues, contradictoria. Si se cree la declaración de Moreno, no hay responsabilidad alguna para la demandada.

De una parte tenemos la declaración del dependiente y de otra la del padre, la de la madre, la del doctor Coll, la del doctor Rivas y la realidad de los hechos. Las cápsulas de tres mínimas no ya tomadas como fueron prescritas, una a·una, sino juntas, no hubieran producido la muerte; las tres de diez mínimas eran bastante para producir la muerte de modo inevitable según el doctor Coll. Según el doctor González aunque las cápsulas por él recetadas le hubieran sido mal administradas al niño, sólo le hubieran causado un trastorno en la economía, nunca la muerte. En

cambio las tres grandes podrían haber causado la muerte no ya de un niño sino de un adulto.

Además, resulta que cuando el doctor González se penetró de la gravedad del caso dice que pidió la cajita que contenía las cápsulas con objeto de solicitar la repetición de la receta. Fué en efecto a la farmacia de la demandada y allí, según él, ocurrió lo que sigue:

"El primer individuo que se me presentó, uno de los que estaba en la trastienda despachando le dije: Tenga la amabilidad de repetirme esta fórmula; él empuñó la caja, la miró y fué al libro de fórmulas donde guardan todas las fórmulas de la farmacia, miró y fué inmediatamente y trajo las cápsulas."

Y las cápsulas que se le entregaron fueron de diez mínimas. Esto es, iguales a las despachadas anteriormente.

La demandada intentó contradecir la declaración del doctor González con la de su dependiente Verdeguer, que depuso en forma tal que sus manifestaciones, por sí solas, revelan falta de verdad, y demuestran la negligencia con que actuó.

Es cierto que si otro dependiente fué el que despachó por vez primera la receta, no puede imputársele la negligencia del segundo dependiente, pero la prueba fué admitida sin objección y ella es por lo menos ilustrativa de·cómo actuó en esa ocasión por su dependiente la demandada. Es una circunstancia que no debe perderse de vista que las cápsulas de diez mínimas venían preparadas de fábrica y las de tres tenían que prepararse en la farmacia. Verdeguer se expresó así:

"A. ¿Ud. conoce al Dr. Luis F. González, de Caguas?—T. Lo conozco en la actualidad.

"A. ¿Allá por el mes de agosto de 1920, el 16 o 17 de ese mes vió Ud. al Dr. González en la farmacia de la Porto Rico Drug?—T. Lo ví.

"A. ¿Tuvo Ud. algún incidente con él, alguna conversación?—T. Sí, señor.

"A. ¿Con qué motivo lo vió Ud. allí?—T. Se presentó allí con

dos señores más; entonces me entregó una cajita y dice: Repítame esto. * * *

"A. ¿Ud. recordaría la cajita si la viera?—T. Una cajita color verde.

"A. ¿Sería ésta la cajita que Ud. vió, parece ésa?—T. Sí, señor.

"A. ¿Qué le dijo él?—T. Me dijo que le repitiera esa receta, saqué una contraseña y me dijo que tenía prisa, que eran unas cápsulas de chenopodio, y entonces yo busqué el libro de fórmulas y le dije: hay que hacerlas. * * *

"A. ¿Quién buscó el libro?—T. Yo.

"A. ¿Qué fué lo que buscó en el libro?—T. La receta.

"A. ¿Qué encontró Ud?—T. Cogí el libro, ví la receta y entonces le dí una contraseña y no la aceptó, dijo que tenía prisa, y le dije: hay que hacerla. * * *

"A. ¿Por qué había que hacerla?—T. Porque la receta pedía tres mínimas y entonces. * * *

"A. ¿Uds. no tenían preparadas de 3 mínimas?—T. No, señor. Entonces me dice: están hechas las cápsulas, y le dije: las que hay hechas son de dosis mayores, de 30 centígramos y de 60, y entonces se las enseñé. Después le enseñé las chiquitas. * * *

"A. ¿De cuánto eran las pequeñas?—T. De 30 centígramos.

"A. ¿Que cuántas mínimas son?—T. Más o menos 5.—Entonces le dice a un señor que quedaba al lado derecho de él. 'Serían de éstas las cápsulas?' y él le dijo que eran más grandes, contestó el señor, y entonces me dijo que le pusiera las grandes, y yo como él es doctor.. * * *

"A. ¿Ud. sabía en aquel momento que él era médico?—T. Porque uno de los compañeros que él vino y le dijo: Dr. vamos, y entonces comprendí que era doctor. Si no no le doy las cápsulas.

"A. ¿De qué clase se las dió, de qué dosis?—T. De las de 60.

"A. ¿Cuántas mínimas?—T. Diez mínimas más o menos.

"A. Vea estas cápsulas. ¿Sería de ese tamaño?—T. De ese tamaño son.

"A. ¿De esa clase también, esa forma? (enseñándole el exhibit C. del Dte.)—T. Sí, señor. Después que le entregué las cápsulas me dijo que le diera aceite de castor y dije: ¿Cuánto? 'Media onza', no guiándome por la receta porque yo había cerrado el libro, y le dí la media onza de aceite de castor y le cobré 25 centavos por las dos cosas.

"A. ¿Quién le pagó?—T. No me fijé.

"A. ¿El le pidió alguna nota de la receta en aquel momento?—T. Me pidió una copia.

"A. ¿Ud. se la dió?—T. Se la dí exacta.

"A. ¿Tres mínimas decía la copia?—T. Tres mínimas.

"A. ¿Cuándo fué que él le pidió la copia de la receta, antes o después de haber despachado Ud. las cápsulas?—T. Después de haberla despachado.   Entonces el doctor se introdujo dentro del departamento de recetas y consultó con el Sr. Daubón. (Dte.)

"A. ¿Ud. está seguro que el día a que Ud. se refiere Ud. sabía que el que estaba pidiendo las cápsulas era doctor, porque se lo había dicho otra persona, pero no sabía qué doctor era?   ¿Es correcto eso?— T. Yo ví que le nombraron doctor González.

"A. Ud. oyó que lo nombraron cómo?—T. Dr. González.

"A. Pero eso lo dice Ud. ahora que le hice yo esta pregunta. ¿Cuando Ud. lo dijo antes dijo que le habían dicho doctor?—T. Sí, señor.

"A. Si Ud. despachó las píldoras al Dr. González sin hacer caso alguno de la receta, ¿por qué no las puso Ud. en otra caja y las puso Ud. en esta caja que tiene ese rótulo que dice: 'Según fórmula del Dr. González?'—T. Porque él dijo: échela que tengo prisa.

"A. ¿De modo que Ud. la echó ahí a pesar de que estaba rotulada de esa manera   *   *   *?—T. El me preguntó la dosis y yo se la dije.

"A. ¿Ud. dice que despachó las cápsulas sin hacer referencia a la receta porque le dijo 'deme 4 cápsulas?'   ¿Entonces por qué esas 4 cápsulas no las puso en una caja distinta, o por qué Ud. no rayó la rotulación de esta caja que dice: 'No. tanto, según fórmula del Dr. González?—T. No me dió tiempo.   *   *   *"

El conflicto existenté entre la declaración de ·Moreno y el resto de la prueba, debe, pues, resolverse a nuestro jui-cio en contra de la demandada.   Es de tal fuerza y claridad y peso "el resto de la prueba," la realidad de los hechos— a la que varias veces nos hemos referido—es de tal natu-raleza, que no es posible dar crédito a la afirmación natural-mente interesada de Moreno.

No consta de modo expreso que dicho conflicto fuera re-suelto por la corte sentenciadora, pero aún en dicho caso llegaríamos a la misma conclusión, porque el error cometido podría calificarse de manifiesto.

Alegaron los demandados la defensa especial de haber ejercitado la diligencia de un buen padre de familia, o sea, la que autoriza el último párrafo del artículo 1804 del Código Civil en los siguientes términos: "La responsabilidad de que se trata en este artículo cesará cuando las personas en él mencionadas prueben que emplearon toda la diligencia de un buen padre de familia para prevenir el daño." Y para probar su alegación presentaron las declaraciones de Ramón L. Daubón y Francisco S. Bruno.

El primero es gerente del establecimiento en que se despachó la receta y declara sobre el cuidado especial que la demandada pone en el departamento destinado a la preparación de fórmulas y sobre la habilidad y gran confianza que le merece el dependiente Moreno. El segundo declara sobre los buenos antecedentes, capacidad y habilidad reconocidas del dependiente Moreno.

Para juzgar el efecto de esa prueba es necesario fijar antes el alcance del precepto legal invocado. Es igual al párrafo último del artículo 1903 del antiguo Código Civil. La parte apelada no cita jurisprudencia alguna aplicable. Tampoco la hemos encontrado en el examen que hemos hecho de las sentencias de la Corte Suprema de España. Manresa se limita en sus comentarios a decir lo que sigue:

"Réstanos indicar para dejar explicado el alcance o extensión de la responsabilidad impuesta a aquellas personas que deben responder de los daños causados por otros, así como los efectos de esta obligación:

"1°. Que dicha responsabilidad cesa cuando las personas a quienes la impone el art. 1903, prueben que emplearon toda la diligencia de un buen padre de familia, estableciéndose en su virtud en dicho artículo una presunción legal de la culpabilidad de las personas citadas en él, pues en razón a las relaciones de autoridad o superioridad que mantienen con los autores del daño causado, la ley presume que les es imputable la causa del mismo por su propia culpa o negligencia, considerándoles como autores morales de dicho daño por no haber puesto de su parte el cuidado o la vigilancia necesaria para evitar que aqué-

·llos dieran origen a él, conforme con cuyo criterio se halla la sentencia de 18 de mayo de 1904 antes citada.    Pero esa presunción establecida por la ley no es absoluta o juris et de jure, sino juris tantum, y por consiguiente, cede a la prueba en contrario.''

※    ※    ※    ※    ※    ※    ※

''Nuestro Código no ha seguido la escuela italiana, sino más bien se ha inspirado en el criterio de la doctrina francesa, puesto que impone la obligación de reparar el daño causado en virtud de una presunción juris tantum de culpa por parte del que tiene bajo su autoridad o dependencia al causante del daño, derivada del hecho de no haber puesto el cuidado y la vigilancia debida en los actos de sus subordinados para evitar dicho resultado.    Así es, que según el párrafo último del art. 1903, cesa dicha responsabilidad cuando se prueba que los obligados por los actos ajenos, emplearon toda la diligencia de un buen padre de familia.    Luego no es la causa de la obligación impuesta la representación, ni el interés, ni la necesidad de que haya quien responda del daño causado por el que no tiene personalidad ni garantías de solvencia para responder por sí, sino el incumplimiento implícito o supuesto de los deberes de precaución y de prudencia que imponen los vínculos civiles que unen al obligado con las personas por quienes debe reparar el mal causado.    Por ese motivo coloca dicha obligación entre las que provienen de la culpa o negligencia.''    12 Manresa. ·Comentarios al Código Civil, 610 y 617.

Si se diera al precepto el alcance que al parecer pretende la apelada, sería muy fácil hacer ilusoria cualquier reclamación establecida bajo el amparo del artículo 1804.    No basta que se elijan empleados competentes.    Esa es una circunstancia a considerar.    Debe demostrarse algo concreto en relación con el caso investigado.

La declaración de Daubón es general.    Nada hay que demuestre en forma clara cómo investigaba la demandada el trabajo de sus empleados.    Qué método ponía en práctica para comprobar su eficiencia.    Cómo seguía paso a paso su conducta.    Qué record llevaba no sólo de su habilidad, sino de su conciencia.

Se trata de uno de los cometidos más delicados que puedan encomendarse a un hombre:  la preparación de fórmulas cuyos componentes son tóxicos en muchas ocasiones.    La

salud, la vida de los ciudadanos dependen de la sabiduría del médico que receta y de la habilidad y conciencia del farmacéutico que prepara y despacha. ¡Cuántas veces trastornos en la salud que degeneran en verdaderas enfermedades y aún en la muerte se deben no ya a la falta de habilidad, sino a la falta de conciencia del farmacéutico que no teniendo una droga, para no dejar de ganar o de sostener el nombre de su establecimiento en el sentido de que tiene de todo, la substituye por otra diferente o de distinta fuerza! ¡Cuándo ocurre un hecho súbito, alarmante, como sucedió en este caso, se toma acción, pero ¡cuántos hechos desconocidos quedarán en la sombra!

Examinada la prueba practicada a la luz de esas circunstancias y consideraciones, no es suficiente para liberar a la demandada de la responsabilidad que contrajo por el acto negligente de su empleado. Véase el caso de *Truyol y Cía. v. West India Oil Co.*, 26 D. P. R. 361, 369.

¿Probó la parte demandante los daños y perjuicios reclamados? No existe en toda la evidencia dato alguno que demuestre a cuánto ascendieron los gastos del padre con motivo de la enfermedad y muerte de su hijo. Ningún daño concreto fué probado. Sólo hay una base: la muerte misma del niño, que ha sido reconocida por la jurisprudencia como suficiente para la concesión de daños y perjuicios en casos de esta naturaleza.

La ley en Puerto Rico sobre la materia es igual a la que rige en California y la Corte Suprema de dicho Estado ha resuelto que: "El elemento principal de los daños es el valor que probablemente hubieran tenido los servicios del niño muerto hasta llegar a su mayor edad; el jurado está limitado al daño pecuniario efectivo causado al padre. La pérdida de servicios no constituye un daño especial que sea necesario alegar. Un veredicto por $20,000 fué anulado por ser excesivo: *Morgan v. Southern Pac. Co.*, 95 Cal. 510; 29 *Am. St. Rep.* 143. Véase también el caso de *Cleary v. City*

*R. R. Co.,* 76 *Cal.* 240, en cuanto a la indemnización a que un padre tiene derecho por la muerte de su hijo menor causada por la negligencia de otro. *Pomeroy's Cal. Code of Civil Procedure,* p. 123.

En el último de los casos citados, la corte dice:

"Bajo el artículo 377 del Código de Enjuiciamiento Civil, el montante de la indemnización a que un padre tiene derecho por la muerte de su hijo menor causada por la negligencia de otro, es aquella suma que, considerando todas las circunstancias del caso, es justa y razonable; y al determinar el importe de la indemnización el jurado puede correctamente tener en cuenta no sólo la pérdida de los servicios del niño durante su menor edad y los gastos de asistencia médica y de entierro, sino también la angustia y sufrimiento moral de los padres." *Cleary v. City R. R. C., 76 Cal. 240.*

Dadas las circunstancias concurrentes en este caso, la angustia, el sufrimiento moral de los padres tuvo que ser necesariamente intenso. En cuanto a los servicios probables del hijo, sólo conocemos que tenía ocho años faltándole trece para llegar a la mayor edad. En Puerto Rico, sobre todo entre las familias enteramente pobres o de pocos bienes de fortuna, no es raro el caso en que un menor de edad trabaja y aporta por completo el producto de su trabajo a gastos generales del hogar. Mucho depende de la condición de salud, de la personalidad del menor. Nada concreto conocemos aquí, pero algún valor será siempre necesario dar a los servicios del hijo.

Atendido, pues, el resultado de la prueba, nos parece que la cuantía de la indemnización puede razonablemente fijarse en tres mil dólares.

Una última cuestión levanta la parte apelada en su alegato, a saber: que no habiéndose probado que el demandante sea padre legítimo de Luis Maldonado, no tiene derecho a reclamar de acuerdo con la ley vigente cuando ocurrió la muerte del niño.

En la demanda se alegó que el demandante era *"padre* de

Luis Maldonado.'' En el acto del juicio declaró Josefa Qui-
ñones y dijo que era casada con Ignacio Maldonado, el de-
mandante, y que "tenía un *hijo* que se llamaba Luis Maldo-
nado," y el demandante declaró también y dijo que era el ma-
rido de la señora Quiñones que acababa de declarar y que
tenía un hijo llamado Luis. Cuando los otros testigos ha-
blan del hijo, lo designan como "hijo," y de los padres, los
llaman "padres" simplemente. La prueba no fué objetada
y de ella surge como presunción que el niño de que se trata
era hijo legítimo de Ignacio Maldonado y de Josefa Qui-
ñones. Véanse los casos de *Díaz* v. *P. R. R., L. & P. Co.,*
21 D. P. R. 78 y *Rivera* v. *Reyes,* 31 D. P. R. 440.

A virtud de todo lo expuesto debe revocarse la sentencia
apelada y dictarse otra condenando a la demandada a pa-
gar al demandante como indemnización la dicha suma de
tres mil dólares. Cada parte satisfará sus costas.

> *Revocada la sentencia apelada y dictada otra*
> *condenando a la demandada al pago de*
> *$3,000 por daños y perjuicios.*

Jueces concurrentes: Sres. Asociados Aldrey, Hutchison
y Franco Soto.

El Juez Asociado Sr. Wolf disintió.

OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SR. WOLF.

La corte inferior declaró probado que el niño en este caso
no falleció por envenenamiento de chenopodio o alguna otra
droga. Para destruir esta conclusión de la corte debió ha-
ber aparecido de los autos que este niño no hubiera muerto
si no se le hubiera administrado ningún chenopodio. La corte
tenía derecho a creer en vista de la prueba que el niño es-
taba muy enfermo y pudo haber muerto por causas natura-
les, toda vez que aunque fué llamado un médico la receta
no le fué administrada hasta un mes después cuando cual-
quier enfermedad del niño pudo haber progresado mortal
mente. La posibilidad de que el niño hubiera muerto sin

la droga o por causas naturales no queda estrictamente ex·
cluída como debe ser el caso para justificar una revocación.
Ninguno de los peritos médicos lo vió antes de su muerte y
las declaraciones de sus padres que tienden a mostrar que él
estaba bien están contradichas por la resolución final de la
madre de administrarle la droga así como por el hecho de
que él estaba sin apetito. No estoy suficientemente conven-
cido de que la corte inferior estuvo equivocada en su con-
clusión especial aunque mis fundamentos principales de di-
sentimiento se fundan en otras consideraciones. Puede
agregarse que asumiendo, como aparentemente lo hace la
opinión de la mayoría que una dosis de tres mínimas sumi·
nistrada tres veces sería inofensiva, entonces no dejo de te-
ner dudas de si quedó claramente probado en vista de la con-
clusión especial si se le dió una cantidad mayor.

Me inclino fuertemente a creer, sin embargo, en vista de
la prueba que aún pequeñas dosis de chenopodio pueden ser
peligrosas si no se les hace desaparecer prontamente del or-
ganismo. Esto quedó demostrado por la prueba pericial.
La madre aportó prueba clara tendente a demostrar que des-
pués de la administración de la droga el niño no vomitó ni
tuvo evacuación del vientre. No hubo ninguna evacuación.
Resultó por tanto evidente, como declaró el perito de la de-
mandada, que no se le dió ninguna dosis suficiente de aceite
de castor. Si el chenopodio es una droga mortal, como de-
claró el perito, entonces no se prescribió una cantidad sufi-
ciente de aceite de castor. En vista de estas circunstancias
me parece que no se demostró que la demandada era respon-
sable por la muerte. Por lo menos debió haberse demos-
trado que la dosis que en realidad se le dió o se supone se
le administró al niño hubiera causado su muerte a pesar de
la administración de la debida cantidad de aceite de castor.

Este es un caso que se asemeja grandemente a un homi·
cidio y en el cual, como en los casos de fraude y otros seme-
jantes, la prueba debió haber sido clara y convincente. Esta

posición se robustece por la sentencia en favor de la demandada. Si hubo una falta de prueba de la culpabilidad en algún sentido no importa que la corte al llegar a su conclusión general hiciera una declaración errónea. Al demandante y apelante incumbía demostrar de modo convincente que la absolución de la demandada era errónea y disipar la duda de que la muerte se debió a la mala administración de la droga por el doctor que asistía al paciente. *Non constat* que el niño no hubiera muerto al administrársele cualquier cantidad de la droga peligrosa dada su actual condición. Según se declaró el niño debió haber sido examinado antes de dársele alguna dosis, y la madre sin aviso alguno del doctor esperó treinta días.

No he pretendido hacer un examen cuidadoso de las autoridades con respecto a la causa próxima y otros particulares semejantes pero me parece que el caso de *Scheffer* v. *Railroad,* 105 U. S. 249, es aplicable. Allí el demandante fué lesionado en un accidente ferroviario como consecuencia del cual sufrió trastornos mentales y físicos hasta tal punto que ocho meses después se suicidó. La demandada quedó excluída de responsabilidad. La Corte Suprema dijo, citando de la corte inferior, lo siguiente:

"Se admite que la regla es difícil. Pero se sostiene generalmente que para justificar una conclusión de que la negligencia o un acto que no llega a constituir un daño inconsiderado es la causa próxima de una lesión, debe aparecer que la lesión fué la consecuencia natural y probable de la negligencia o acto ilegal y que debió haber sido prevista a la luz de las circunstancias concurrentes."

Considerado el hecho de que el chenopodio sólo se administra generalmente con copiosas dosis de aceite de castor y después de un examen cuidadoso de la condición del paciente, hecho por el doctor que lo asistía, no estaba dentro de la previsión de la demandada el hecho de que la droga sería administrada sin el debido purgante de aceite de castor. El punto principal de mi disentimiento es que no ha

quedado excluída la posibilidad de que el niño estaría hoy vivo si se le hubiera administrado aceite de castor en suficientes cantidades.